Ms. Erickson? Good morning. May it please the Court, I am Elizabeth Erickson. Seated at council table is my co-counsel Dana Johnson. Together we represent appellants Wilderness Watch and Friends of the Clearwater in the matter before the Court today. I would like to reserve five minutes of my time for rebuttal, please. Manage your own time, though. I'll remind you of it. Thank you. In 1963, in the discussions leading up to the passage of the Wilderness Act, the Secretary of Agriculture under John F. Kennedy explained to Congress how the Forest Service would interpret and implement the Wilderness Act as it related to pre-existing water retention dams. He said, Water developments for the storage and diversion of water for irrigation have been allowed in these wilderness-type areas. The works generally have been constructed and maintained by means which did not involve motorized transportation. We would construe the provisions of the Wilderness Act as permitting the continued maintenance of these projects, these existing projects, by means which would not involve motorized transportation, as in the past. It was with these very words in mind that Congress went on to pass the 1964 Wilderness Act to assure that an increasing population accompanied by expanding settlement and growing mechanization does not occupy and modify all areas within the United States in its possession. The whole thrust of your suit was to prevent these helicopter flights, right? Yes, Your Honor. And among other relief, you sought a preliminary injunction to prevent them from occurring, correct? Correct, Your Honor. And at the time you sought that relief, they had not occurred? Correct. If you had gone forward with that and lost, you would have had a right to an immediate appeal to our court, correct? If we had appealed the preliminary injunction. Yeah, the denial. The denial of the preliminary injunction. You would have had a right to seek our review again before any flight occurred. Yes, Your Honor. But you withdrew that. Your Honor, we... Your client, I don't mean necessarily you, but your client withdrew that, right? Prior to the appeal, after we filed our newest appeal, we were waiting for a response from the district court before we could file an emergency injunction pending appeal in the Ninth Circuit to try and stop the helicopter flight, which had not yet occurred. And it was in that interim period that the flight actually transpired. And so we are here today to request declaratory relief from this court because the very nature of a helicopter... Did you get to court quick enough to prevent the flights that by the time Judge Molloy considered your concerns, the flights had already happened? Yes, Your Honor. And the very nature of a helicopter flight is such that it is short, it's brief. I hate to beat a dead horse, but how much time you withdrew your request for a preliminary injunction and based on your being told that you would be advised when the flights might reoccur, is that correct? Yes, Your Honor. And how much time were you told you would be given? I believe it was 30 days notice. And were you given 30 days? We were given 30 days notice. Okay. And... When did you go to court? On the first day of those 30 days or at the end or in the middle or what? I believe in the interim between when the notice was given that the dam owner... They have a window of opportunity when they could do the flight depending on whether... I'm actually just looking for a number. You had 30 days. 30 days. And did you go to court on the first day, the 15th day, the 29th day? What day did you go to court? I don't know the exact number, Your Honor. It's kind of important, isn't it? Well, Your Honor, the nature of a helicopter flight is such that it happens quickly and it's over quickly. And we are... But they gave you notice. True. Excuse me? They gave you notice of when they're... They did give us notice. Correct, Your Honor. And you could have sought emergency relief from the circuit. True? I imagine we could have at that time. Right. So I guess this leads up to the big question is why isn't this case moved? The flight's already occurred. Thank you, Your Honor, for that question. The very nature of a helicopter flight is that it is brief. It's over before a circuit court can hear an appeal on its merits. But don't we... We're not just looking at the duration of the flight. We're looking at the duration of the time from which notice is given that the flight's going to happen because that's the opportunity you would have or any litigant would have to challenge the flight. Right? So is it your position that that period of time is or would be too brief to challenge it? Because the record looks like... I just want to be fair to you. The record looks like there was time and that that opportunity wasn't taken. So why am I misreading the record? Your Honor, in this situation, the helicopter portion of the project was one small portion of a larger ongoing project. And so there was a window in which that helicopter flight might take place. So the project required work on either end that entailed horse packing in various other materials and entailed additional work that took multiple days. And so we did not know the specific date at which the helicopter would fly. Right, but it just strikes me that you don't need to know the specific date. You knew that the helicopter flight was going to happen. And my question really gets to, is it your position you didn't have enough time to seek emergency relief with the circuit? Your Honor, the district court denied our motions for preliminary injunction. We filed a motion for preliminary injunction and stipulated to the notice period with the opposing counsel. And then a year went by as we were litigating the case. And then we received the district court order and then filed our notice of appeal. And while we were waiting for a response from the district court, and we filed a motion for injunction pending appeal, and while we were waiting for a response from the district court before we could go on to file in the Ninth Circuit, that's the point at which the helicopter flight. Right, but we have motions panels that are in continuous operation. In fact, Judge Kristen is on a motions panel. I think she decided a couple of emergency motions this morning before coming to court. So we deal with environmental emergency motions all the time. We deal with a whole variety of emergency motions all the time. And I don't want to fault you for that, but that's what people do to keep a case from becoming moot. And now the flight has taken place. So why isn't the controversy over? Your Honor, we would request that this court grant declaratory relief because this is an area of the law where the helicopter portion of a project will oftentimes transpire before an entire case can be heard on the merits. This particular dam owner has requested helicopter access in the past. We have reason to believe we'll request helicopter access in the future.  On the basis for access. Because if you're trying to rely on the evading review portion of the exception, capable of repetition but evading review exception to the mootness doctrine, you have to show that this is going to repeat itself in the circumstance, not just generically that there are going to be helicopter flights. So what's in the record before us that would indicate to us that another helicopter flight is imminent? This helicopter flight was requested for routine maintenance activities to the dam to carry in a 17-foot pre-welded catwalk piece of steel. And that is part of our argument that the very design by the dam owner of this catwalk that could only be transported in using a helicopter necessitated us even being here today. The whole reason we're here is based on that design. This is a separate problem, and I don't mean to lead you astray, but I'm not sure if you can get past mootness, what kind of declaratory relief would you have us enter? Let me just tell you, here's my problem. It always seems to me that there is a weighing, because the question is whether or not motorized vehicles are going to be used. We know under some circumstances they may be. And the reasonableness of that is always a function of the project that is proposed. So the next project might be very different. The next project might not contemplate one or two flights. It might be a whole lot of helicopter flights, for example. And there may be much more feasible alternatives to helicopter flight the next time this comes around. So what kind of relief would you have us enter? So, Your Honor, this particular activity was for routine maintenance of a wilderness dam that has been maintained using non-motorized equipment. Well, I have to differ with you and maybe correct you, but this was not routine maintenance. The catwalk was eroding. It was dangerous. It was in danger of collapsing. And it was a fairly one-time maintenance project. I think the record shows, maybe you can disagree with me, that the routine maintenance of the dam has always been done manually using pack animals. Isn't that so? Your Honor, the catwalk that existed on site at the time was constructed from materials found on site by hand. And it had been there for well over a decade, probably longer. Well, just looking at the pictures, I wouldn't want to work on it. I don't think you would either. I thought it was uncontested that repairs were needed. Is that right? Repairs, we do not contest that repairs are needed. However, what we do contest is that the extent of the new catwalk, a 17-foot welded 600-pound piece of steel that was designed in a way that could only be flown in using a helicopter, is what necessitated this action by my clients. Because if the dam owner had designed a different design, or if the Forest Service in the NEPA process had requested that the dam owner design a different catwalk to go from something that is logs that were constructed on site to a 600-pound welded piece of steel, there has to be something in the middle that can be done in a non-motorized fashion that will... Well, correct me if I'm wrong, but I think the Forest Service said it was beyond the scope of their jurisdiction to dictate to the dam owner exactly what kind of materials to use, true? Your Honor, under the wilderness sack, there is an express... No, I mean, that's the position they took, correct? The Forest Service did take that position. So let's take that as an assumption. If that's true and the Forest Service was correct in saying they didn't have any jurisdiction over what the type of catwalk to be installed, where does that leave you? Well, Your Honor, we maintain that the Forest Service's duty under the Wilderness Act is to protect the wilderness area, to protect the wilderness values. It is the dam owner's obligation to maintain a safe dam. Nowhere in the record does... Do any of the dam safety laws demonstrate or does the agency demonstrate that a 17-foot welded piece of steel is the only thing that will satisfy dam maintenance safety laws? So there's no specifics to that. Forgive me for interrupting. Getting back to my question then, what kind of declaratory relief are you looking for? Would it be... From that, from your representation and from the complaint, it looks like you're... I'm almost left with the impression that you're asking for something that's absolutely moved. In other words, a declaration that they can't choose to repair their dam this way using this big piece of steel next time. We are asking for a declaration that the Forest Service has the obligation to condition the access of a dam owner in this type of a situation, to say that the dam owner must come back to them with another alternative that complies with the Wilderness Act. But there are no current proposals to that effect, true? There are no current... We're getting back to movements again, but the work has been done. And the doctrine of capable of repetition yet evading review has to be site-specific in this case. So what is going to happen on this site that we need to declare, issue a declaratory judgment about? Your Honor, this is an ongoing relationship between the dam owner and the Forest Service. The dam owner is required under the safety laws to maintain the dam. If that maintenance necessitates motorized use, then they have to request that from the Forest Service. And this particular dam has requested motorized use in the past, and they will have to maintain their dam. And they were granted relief, true? They have been granted relief previously. They've also been denied relief previously. So your time is winding down, and I want to make sure you get to the merits of the argument. The Forest Service considered three alternatives. First was no action. And the Forest Service said no action was not the preferred alternative because if no maintenance, if the catwalks were not reconstructed, no maintenance was not performed, the dam was in danger of collapsing. That would cause massive erosion, turbidity in the waters, and a whole lot of other consequences. Do you agree with that assessment? I do not agree with that assessment, Your Honor, in the sense that the only alternative that raises a concern, dam breach, and all of the results of a dam breach is the no action alternative. Right. Do you think the Forest Service was justified in rejecting the no action alternative? Yes, Your Honor. So that's off the table. Correct. The second one was the helicopter flights, which we've discussed. And the third one was to use pack animals. And the Forest Service said if we use pack animals, pack in the materials, we're going to have to widen the trail, we're going to have to engage in blasting, we're going to have to destroy or alter the portion of the wilderness. And therefore, it concluded that helicopter flights would do the least damage to the environment. What's wrong with that? Your Honor, the Forest Service maintains trails in wilderness all the time. They use blasting. They use tools. Pack stock access on wilderness trails is something that happens throughout wilderness areas constantly. This is a trail that has been used to access this very dam for over a century, since it was constructed in 1914, this very same trail. So the very argument that the trail does not need to be upgraded or that by upgrading the trail that they will somehow, it will be more detrimental to wilderness character, wilderness values, does not hold water in this situation. Well, then we have to look at our standard of review. We don't get to be Forest Service managers. We don't get to make the choices, even if we think they're, you know, or second guess them if they think they're wrong. All we have to do is say, did they take a hard look? And they said blasting is worse than a helicopter flight. Under our standard of review, it's kind of hard to say that that judgment was wrong, isn't it? Your Honor, the Wilderness Act does not allow for that type of balancing act in the statute of regulations between an activity that is expressly prohibited and an activity that is lawful under the Wilderness Act. Well, it's prohibited, but there are exceptions, right? There are very narrowly construed exceptions that we maintain do not apply to this situation. Okay, but that gets back to Chief Judge Thomas's point, which is that we're not forest managers. What's wrong with their assessment, with their determination about what was going to do the least amount of harm? They do not have the discretion, and under any of their analyses, they determined that the non-motorized alternative accomplishes the goals of the project. That is the very essence of this case, is that the Forest Service, not me, not this panel, determined that the non-motorized alternative accomplishes the goals of providing adequate and reasonable access and maintaining a safe dam. And under the Wilderness Watch, the U.S. Forest Service case, the COFA case as I call it, the Ninth Circuit said that the agency is obligated to choose a non-motorized alternative that has the least impact in the situation to wilderness values. And the agency determined that the non-motorized alternative accomplishes the goals of the project and maintains the dam safely. Thank you, Counsel. Thank you. Good morning, Your Honors. May it please the Court. I'm Mark Smith. I'm an Assistant U.S. Attorney with the District of Montana. With me at Counsel table is Nina Robertson with ENRD's Appellate Division. We are here on behalf of the Forest Service. The Forest Service finds itself in the middle of a controversy between two stakeholders that want management to go in two different directions. Wilderness Watch wants to preserve the Selway Bitterroot Wilderness in violence against any motorized trammeling, but the Forest Service has to respect the rights of private in-holders like the Fred Burr High Lake Dam. So the question is how to preserve wilderness while allowing access. Can you quickly, if you can and if you can't, that's okay, but can you respond to my question about on what of the 30 days Wilderness Watch asked to revive their motion for preliminary injunction? Yes, sir. The stipulation whereby the parties agreed to set aside the preliminary injunction was entered in June of 2012. That's at Excerpt of Record 49. On June 5th of 2013, the Forest Service provided notice that that stipulation was no longer in effect because they had been notified by the dam owner that they were going to do the flight in 30 days. So that happened in June 5th, 2013. I'd refer the court to SER 22. The flight actually occurred three months later on September 6th, 2013. So there was more than adequate time after the notification for plaintiffs to have filed some kind of a preliminary injunction or a state pending appeal. When did they file? When did they file the motion for state pending? When did they revive their motion for preliminary injunction? That I don't have off the top of my head, Your Honor. I'm sorry. Okay. But they were given 30 days notice and actually the flight did not occur for three months. Correct. Okay. All right. Thank you. Yeah. It really boils down to a simple calculus. What's better for wilderness? Forty-five minutes of noise from a helicopter bringing in a 600-pound catwalk or days of explosives work that's going to permanently improve a primitive trail so that that same catwalk can be cut into pieces, loaded onto the backs of mules, and brought in on a trail. Where in the record does it say it would have taken days of explosive work? So when the Forest Service was examining in the environmental assessment, which option was going to have more impact? And I would refer the court here to excerpts of record 171 and 172, saying that blasting is going to leave permanent evidence of man and his works going to irretrievably lose the recreational opportunity class 2 trail, making the area more accessible, less challenging, less primeval, and less wild. So I guess I should explain. So what I was looking for is where in the record does it say it's going to take days of blasting? Excerpts of record 171, 172. Is it what you just read? No, that's additional information. I didn't hear a duration. And I'm not trying to be a stickler. It's that I think what you're comparing is, you said the brief, helicopter flights versus days of blasting. Yeah, and if the court would look at Appendix C, that's the Fred Burr Trail 38 Condition Survey, it says, so this is ER 172, blast rock. And there's a duration, a time estimate there. Okay? And there are several categories. If you look down, bar or blast rock, two days. Thank you. Okay? And there are several entries along those lines because they anticipated they're going to need to blast in many different locations. I have one other question along this line. I think somewhere in the record, although this morning I couldn't find it, but I had it last week, there was a change of plans, wasn't there? And so that part of the material was taken in by helicopter, and then I think the owner took in the cable overland. Is that right? Yes, correct. So did the trail have to be blasted in order to take the cable in overland? No. Why not? That wasn't explained, or I couldn't find the explanation. The way the Trail Reconnaissance Report explains it is that the, you know, if you put these really long, really outsized, awkwardly shaped catwalk pieces on the back of a mule, and you're going up this Class II trail. Now, a Class II trail, by design, is intended to be very rugged. Okay? In a wilderness, you are supposed to confront wilderness on its terms. They have these classifications that go from one through four, right? Class II is basically unaltered. They scratch out a little bit of a trail so you can identify it, but they don't improve it. If they're going to haul in these outsized catwalk sections on the back of a mule, they're going to need to clear away all the leaner trees, all the brush that's encroaching. So suddenly it becomes far more difficult to, you know, to get that mule up that trail. I think that's the part I do understand. What I don't understand is why wasn't that necessary to bring the cable in? Was it brought in not on a mule? How was it brought in? Well, so after the project was finally implemented, they determined that they weren't going to need as long of a cable as they thought they were going to need. So it was shorter, and that apparently enabled them to pack it in on a mule. There's not a lot on that in the record, you know, outside of what was provided in the supplemental declaration of Mr. Ritter. But it was packed in on a mule? It was. It was shorter than they had originally anticipated. Thank you. And am I correct that the trail on the last mile is about straight up with about 35 switchbacks? Thirty to 50 percent gradients, treacherous footing. And I think the reason that they would need to do the blasting is because you couldn't actually turn an animal with that steep of a hill without it sort of knocking itself over. So that's why the reconnaissance, they had this experienced packer do a detailed reconnaissance of the trail, and he said, you know, this is extremely dangerous, and in order to make it passable, we're going to have to use these explosives. It's going to irretrievably improve this trail, right? So in the future, this is going to be, you know, more accessible by more people. Anybody that wants to enjoy that wilderness is going to have to contend with bigger crowds because suddenly it's a lot easier for everybody to get in there. Did the Forest Service ever ask the dam operator whether something less bulky, less heavy than a steel catwalk could solve the problem? The Forest Service, in the process of analyzing alternatives in the environmental assessment, looked at the pack stock option, and then they gave preliminary analysis to another option, which was backpacking the catwalk up to the lake using force of volunteers. My question was, apparently the dam owner said, we've got an unsafe catwalk made of wood or whatever. We want to replace it with this 600-pound steel catwalk, correct? Correct. Did the Forest Service ever ask the operator, is there something in between a wooden catwalk and a 600-pound steel catwalk that might be brought up the trail? No. The answer to your question is no, not that I know of, Your Honor. And why not? And I'd like to speak to that point a little bit if I could because this whole idea of imposing a requirement that the dam owner demonstrate that the maintenance project is the minimum necessary, plaintiffs have failed to provide any citation of authority for that in the Wilderness Act. No, but I think as a practical matter, the question is, couldn't the Forest Service have said, use logs on site to replace this catwalk? Did you have the authority to do that? I don't believe that the Forest Service did, and the problem stems from the fact that the valid occupant here, the Fred Burr High Lake Organization, owns the dam. They've owned it since 1916 when they built it. They do not own it in fee simple, though. No, no. They own the dam structure. They don't own the land underneath it. Right. Okay. So they have sole liability and responsibility for operating it. Excuse me for interrupting, but they possess it under a special use permit? That's correct. And why can't the Forest Service condition the special use permit? The special use permit has several provisions about what the permittee needs to do, and they're generally, you know, in terms of maintaining the dam and keeping with the aesthetic, you know, that prevails up in that vicinity right now. But the dam owner, and I keep coming back to this because it's central to the point of why a steel catwalk is required, they're solely responsible and liable for maintaining a safe dam. And in order to implement that requirement, the special use permit requires that they keep up to date with dam safety requirements, statutes, and guidance. Right. And there are two statutes involved, the Federal Dam Inspection Act and the Dam Safety Act, true? True. And there's also a lot of guidance and a lot of regulations, and all of that's contained in Appendix A of the Environmental Assessment. And the upshot of all of that is that the dam owners, when they identify a deficient practice, okay, they are to replace that or fix it using the best current technology, which in this case is a 17-foot long single-span metal catwalk. And Fred Burr actually wrote a letter to the Forest Service, the company that owns and operates the dam, wrote a letter to the Forest Service saying, look, we designed this thing to withstand the conditions up there, which are very harsh. You know, there's high winds, the driftwood in the lake bumps into this structure, and it breaks down. And if you look at the photographs of the catwalk as it existed, it was clearly degraded. So the idea that the Forest Service should then go to the dam owner and say, no, you need to make it less safe, you need to make it less robust, that doesn't exist in the Wilderness Act. And I would say that it's contrary to the policy interests of maintaining a safe dam and protecting the wilderness. But I gather from your answer is that the Forest Service may have thought that was the best thing to do, but you're not saying that the Forest Service couldn't have gone to the dam owner and said, consider this alternative. Is that right? I mean, it's implied in your brief that it's outside the Forest Service's jurisdiction to do that, but I question that. I don't know whether... It may have been unwise, or you may have had reasons, but you certainly could have asked. True. Well, again, I mean, having been presented by the dam owner with the representation that the single span is critical, and this is the term they use, critical for the safety of the water commissioners and the reliability of this structure, and that in order to be able to reliably access the valve that adjusts the water level, that this was a critical design. You know, in lieu of any alternative proposals for accomplishing this, the Forest Service wasn't arbitrary and capricious for accepting that representation. That actually was my question. I'm not suggesting it may have been wise or unwise. I just said you could have. I didn't say you should have, but you legally could have gone to the dam owner, because these informal exchanges occur all the time, don't they? Right. Yeah, and I'm not aware of any prohibition against safe dams. Let me turn to an argument I did discuss with your opponent, and that is the fourth alternative. Willingness Watch offered a fourth alternative to the Forest Service that the Forest Service did not consider, which is, I think you referenced briefly, the use of volunteers to backpack the materials up there. Why didn't the Forest Service consider alternative four? Okay, so again, I would come back to the problem with the representation from the dam owner, that the single span was necessary to maintain a robust structure that's going to withstand the elements. Every time you make a cut in this thing, you're bolting it back together, you're creating a new potential point of failure. And this was something that the dam owner specifically objected to when the backpacking proposal came in. I mean, a mule can carry a six-foot-long section of catwalk. You're going to have to cut it into even smaller pieces in order to make it packable by a human being. And then there were practical considerations. I think my question is somewhat different. I probably was not as articulate as I should have been. I can understand the Forest Service reasons for rejecting alternative four, but my question is, why didn't that form the basis of your analysis at all? Because you have three alternatives that are analyzed, and the fourth one was not analyzed. And you're giving me your reasons why it wouldn't work, but why shouldn't the Forest Service have included that within its analysis and the environmental assessment? So in the NEPA process, and alternatives are the heart of the NEPA analysis, but the Forest Service has discretion to reject at a preliminary stage alternatives which are not going to satisfy the objectives of the project, or because they're similar to another alternative that is going to be detailed or analyzed in greater detail. Here, as I've indicated, the problems with the pack stock option were sort of amplified by the backpack option. And there were other problems that prompted... Before you go on, were they? My understanding is that using the mules would require blasting. Right. But wasn't it the case that using people didn't? Yeah, that's correct. The problem that would be aggravated would be, you know... Smaller pieces. Right, smaller pieces. And it's going to be worse for the resource because it would require 15 people, 15 head of horses or mules, and they'd be in the wilderness for at least three days. So the Forest Service has to consider that impact. But my question is, why didn't the Forest Service say, here's a fourth alternative and we're rejecting it because of the factors you just described? It's just not considered in the analysis as a identified alternative. Well, I had this identified in the record at 305, excerpt of record 305. So I'm not sure to what extent they delved into these details in the preliminary analysis, but I know it is contained within the record as a rationale. No, but you would agree that it was not formally considered as an alternative. Oh, yeah, for sure. That's correct, Your Honor. I'd like to touch upon some of the points that the court emphasized regarding mootness and also regarding standing. We today have no indication that any member of Wilderness Watch was in the Selway Bitterroot Wilderness or in the Fred Bird Drainage on September 6, 2013. That's when this flight occurred. It was 45 minutes. Helicopter came in high to avoid impacts to the wilderness. Had this catwalk suspended on a long line, came down. There were three guys on the ground. They disconnected it. Helicopter turned around and it left. A minute later, the sight of the helicopter, the sound of the helicopter, the only things that these plaintiffs complained about were gone. Wilderness Watch has the burden of establishing Article III constitutional standing throughout this litigation, including this appeal. They can't have organizational standing if its members lack standing. And because we don't have any evidence that a member of Wilderness Watch was present when the helicopter flight occurred, we have no evidence of an injury that they have complained of. Generalized harm to the environment is not enough, and a procedural deficiency isn't enough if they can't tie it to a substantive harm to the environment. So there is right now a significant question regarding whether plaintiffs have demonstrated Article III standing. In lieu of that standing, there is no jurisdiction and the case has to be dismissed. A similar principle that the Court talked about, also dealing with the absence of injury in fact, is mootness. Because the harms that were complained of in the complaint were so ephemeral, so limited in time and space, there's really no effective relief that the Court can grant. We can't go back in time and undo those harms in any way, shape, or form. Plaintiffs claim that declaratory judgment solves that problem, but that's not really true. If you look at the case authority, it indicates that a case or controversy exists justifying declaratory judgment only when the challenged government activity has not evaporated or disappeared. That's in Feldman v. Bomar, 518 F3rd at 642. Evaporated or disappeared, I mean, that's actually a pretty good description for what happened to the noise of the helicopter here a minute after it left. That evaporated. Was there ever any request for declaratory relief or injunctive relief that went beyond the scope of this project? No, there is not, Your Honor. In the complaint, everything is tied to this project. And that's really as it has to be, because this is an APA case. It's tied to the record that was developed for the decision. For this particular repair, this particular situation. Exactly. Yeah, and if you look at the case authorities, and this applies particularly when we're talking about recurrence under the capable of repetition yet evading review doctrine. As long as we're discussing that, does the Forest Service anticipate that there will be other helicopter flights over the wilderness area as a whole? Yes. So, in fact, if we broaden our perspective, this is a recurring issue. True? This issue has to be identified in terms of the specific controversy. Right. Well, how many dams are there in the wilderness? Sixteen. Sixteen. And they all require maintenance? Yes, sir. So you would anticipate receiving other requests for helicopter flights over the 16 dams? I think that's probably safe, yes. But every time you get a request, it's going to – first let me say this. The helicopter requests for Fredbear, there are no future anticipated helicopter requests in that area. They say that this catwalk is going to last for the foreseeable future. But it's likely. They're likely. Likely over what timescale in the Fredbear drainage itself? Certainly over the Selway wilderness writ large, it's likely. But I would say in that context, every time you have a request for access, the facts are going to be different. The nature of the maintenance that needs to be done is going to be different. Conditions of the trail are going to be different. And the decision might ultimately be different. I mean, at this dam in 1973, the Forest Service rejected a request for helicopter. But it seems to me what you're telling the panel is that Wilderness Watch's tactic, choice, is to file another lawsuit when they find out you're planning on doing this. Yeah, and I believe that that's required. But their position is that under the Wilderness Act, helicopters aren't permitted anywhere. Yeah, and I think a plain reading of the Wilderness Act pretty clearly refutes that. Well, perhaps. But, I mean, I think they would like that claim litigated. Right, and if this Court were prepared to say that the Wilderness Act is a blanket prohibition on all helicopters, then, indeed, that question would not be moved. Counsel, you mentioned it made a standing argument a minute ago. Did you brief standing? Yes, it's in footnote 3 of the brief. So it was not developed in great detail in the text itself. However, like I say, it derives from the same jurisprudential concept, right, of injury in fact, that we have to have a redressable injury. All of these are predicated on the Constitutional Article 3 concepts of justiciability. So it is discussed in the brief, not in. I found it. I have my reading glasses. I found it. So. Smaller font, too, I think. Yeah. I'm sorry about that. Sneaky. Your position is because these helicopter flights, which could occur, you can see it in the future. Yeah. For repair and maintenance of the various dams within the wilderness area. Because the conditions under which the Forest Service might allow future flights are so different, factually different, that the responsibility of Wilderness Watch is to file a separate lawsuit each time they learn or anticipate there might be a flight. That's correct. And I would refer the court. And that's your answer to judicial economy. Your Honor, I believe that that's required under the APA because every decision is going to be moored to different facts and a different administrative record. And if you look at ONRC, if you look at the wolf recovery case, if you look at High Sierra hikers, all of those cases basically say when you're talking about the APA, the propriety of the decision is irretrievably tied to the administrative record and the facts that are developed to support the decision in that case. We love lawsuits. I guess we may be seeing you again then. Thank you, Counsel. Thank you, Your Honor. Your Honor, Wilderness Watch's position is that if this helicopter access is allowed to proceed for a project of this magnitude, then what project will not be allowed helicopter access in the future? The government has argued that it's just a one-hour helicopter flight. It's just this one small drainage. But if this routine maintenance project on a low-hazard dam that has been accessed via a trail for over a century is allowed to have a helicopter for this particular project, then what project will not be allowed helicopter access? Well, I think we've established that it's capable of repetition, at least within this wilderness area, if not this site. But why does it evade review? I mean, the government's point is, look, every situation is somewhat different. And as cumbersome as it might be, you're required to file a suit. And, in fact, I think you could have had the review in this court prior to the helicopter flight. Why does that mootness exception? Why do you think the mootness exception applies? Your Honor, our timeline for our district court injunction briefing is located at page 5 of our brief. We filed for a motion for a stay of judgment and PI in the district court and completed the PI briefing on August 22nd, and then the flight occurred on September 6th, so shortly after. And, again, just the very nature of a helicopter flight is that that portion of a project, and typically they're not a project, a standalone project, they're part of a bigger maintenance project that has activities on either end, that portion can happen quickly. Is opposing counsel right that you had notice as of June 5th? Excuse me? Is opposing counsel correct that you had notice of this project as of June 5th? I'm not certain of the exact date that they provided notice. But we do have our motions panels, as I mentioned. We often, whether it's a wild horse roundup, whether it's a timber sale, whether it's a planned mine expansion, we get motions for restraining orders all the time in environmental cases. So why should this be the exception? Your Honor, in the interim between when we were waiting for a district court order on our PI briefing and before we had a chance to file an emergency motion in the Ninth Circuit, that's the window in which the flight occurred. And going to the standing argument of the government, the Wilderness Act has determined that helicopter flights are harmful to wilderness values, wilderness character. The sheer idea of wilderness is a place where humans and their works do not remain and their impacts do not remain. And our standing declarations, ER 86 through ER 100, indicate that they would not use the strainage when there's the possibility that there might be a helicopter flight that's going to be used. It changes that experience. It's the whole wilderness experience. It's why we go to the wilderness. And how do you respond to the government's argument that no member of your organization was present during the helicopter flight? Your Honor, the missions of the plaintiffs' organizations, the appellants' organizations, are to protect wilderness values. And wilderness values, it's that sense of wilderness, knowing that you can go to a place that is not going to have the impacts from motorized, mechanized use. And going to a place where you might hear a helicopter or where now you see a 17-foot welded piece of steel that is very clearly has been flown in by a helicopter, that changes the feel of the place. It changes the feel of Fredbear High Lake. It has altered the wilderness. And that particular design of a catwalk would never have been there if the helicopter access were not authorized. A couple points I want to make. Packed stock was used in the alternative that was selected and was carried out. They took stock all the way up the climbing turns to the dam. The only distinction that the Forest Service made was that a packed animal cannot carry a piece of dam that was – or, excuse me, a piece of catwalk that was that wide. Again, they did not thoroughly analyze the non-motorized alternative using hikers, hiking that in. The lightest – or, excuse me, the heaviest piece of catwalk, under the design that the dam owner did not design, the civil engineer for the Bitterroot National Forest came up with a design that could be packed in without using a helicopter. And the heaviest piece was a 57-pound piece. I could carry that in the last mile and a half of trail. I'm not a big person. My co-counsel and I could have completed that portion of this project using non-motorized means. But the Forest Service never asked the dam owner to provide a different alternative, and they did not thoroughly analyze that alternative and look at other options. Thank you, Counsel. Thank you. The case has heard will be submitted for arguments. I want to thank all the counsel today. It's not easy to argue under these special circumstances when we have special hearings. So thank you all for your very good performances.
judges: Thomas, Hawkins, Christen